**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **GREGORY T. HOLDEN,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-24-105** |
| **DAVID DONALDSON, SR.,** *et al.*, | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

Gregory T. Holden, a prisoner currently incarcerated at Western Correctional Institution ("WCI") who is proceeding without counsel, filed this civil rights action pursuant to 42 U.S.C. § 1983 against correctional officers David Donaldson, Sr., Angela Platter, David Fitzgerald, and Kimberly Fink (f/k/a Kimberly Durst) ("correctional defendants"), as well as RN Karen Coleman.[1] Holden alleges that the defendants violated the Eighth Amendment by denying him a decontamination shower after Donaldson sprayed him with mace and that they violated the Fourteenth Amendment by failing to follow official policy on the use of chemical agents. The correctional defendants have filed a motion to dismiss or, in the alternative, for summary judgment. ECF 28. Coleman has filed a motion for summary judgment. ECF 21. Both motions are fully briefed. ECF 21-1, 25, 27, 28-1, 31, & 36. Coleman also has filed a motion to stay. ECF 37. Holden has filed a motion for leave to amend his complaint, ECF 43, which the correctional defendants oppose, ECF 44. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the following reasons, Holden's motion for leave to amend and Coleman's motion to stay are denied. The

---

[1] The Clerk shall correct the defendants' names on the docket.

correctional defendants' motion, treated as a motion for summary judgment, is granted. Coleman's motion for summary judgment is granted.

## I.    Background

### A.    Holden's Allegations

Holden alleges the following in his unverified complaint.

In July 2021, Holden was incarcerated at North Branch Correctional Institution ("NBCI").[2] ECF 1, ¶ 8. On July 2, during outside recreation, Holden felt an "itching/burning sensation on his back." *Id.* ¶ 6. A fellow prisoner examined Holden's back and advised him to "get checked out by medical." *Id.* ¶ 7. Holden then spoke to a social worker, who in turn "had [him] sent to medical." *Id.* NBCI medical staff examined Holden and then transferred him to WCI's infirmary for further treatment. *Id.* ¶ 8. WCI medical staff examined Holden and told him that he had shingles. *Id.* ¶ 9. They gave him "some pills and an oily substance to put on his back." *Id.* Holden remained at the WCI infirmary for several days. *Id.* ¶ 10.

On July 6, while he was still at WCI, Holden "became depressed and did not want further treatment for his shingles, nor did he want to eat his meals." *Id.* WCI medical staff again examined him and discovered that his blood pressure was dangerously low. *Id.* ¶ 11. They sent him to the emergency room, where the doctor "advised that the oily substance that WCI medical staff was putting on [Holden's] back was the cause of his low blood pressure, and advised . . . medical staff to stop administering it." *Id.* ¶¶ 11–12. Holden was returned to WCI within a day. *Id.* ¶ 13.

On July 7, back at WCI, Holden "had a psychotic break" and began to flood his cell. *Id.* ¶¶ 13, 15. Coleman, a nurse at WCI, told Donaldson that Holden was flooding his cell. *Id.* ¶ 14. Donaldson came to Holden's cell and ordered him to stop, but Holden ignored him. *Id.* ¶ 15.

---

[2] All dates are from 2021 unless otherwise noted.

Donaldson again ordered Holden to stop and "to come over to the feed up slot to be cuffed up." *Id.* ¶ 16. Instead of complying, Holden "picked up the bed side table" in his cell "and threw it at the door." *Id.* Donaldson then ordered Holden again "to stop destroying the cell," and Holden again threw the table at the door, breaking the table. *Id.* ¶ 17.

At this point, Donaldson sprayed Holden's chest and face with mace. *Id.* ¶ 18. Donaldson then ordered Holden again "to come to the feed up slot to be handcuffed." *Id.* Holden ignored Donaldson, "picked up a table leg that had broken off from the table[,] and hit the bathroom window[,] causing it to break." *Id.* ¶ 19. Donaldson then sprayed Holden again. *Id.* ¶ 20. Holden continued to pace around the cell, but he "slowly began to return[] to reality" "[a]s the bursts of chemical agent began to take effect[.]" *Id.* ¶¶ 20, 22. After Donaldson once again ordered Holden to come to the cell door to be handcuffed, Holden "dropped the table leg" and complied. *Id.* ¶¶ 21–22. At this point, Holden was "calm, not a threat to anyone, and no longe[r] being disruptive." *Id.* ¶ 24. He was moved to a different cell. *Id.* ¶ 23.

After being sprayed, Holden felt a "burning" sensation. *Id.* ¶ 25. Holden asked Donaldson and an "unknown officer" for a decontamination shower, but they denied his requests. *Id.* ¶¶ 25–26. Holden also requested that the unknown officer give him "something to wash himself with to stop the burning," but the officer refused. *Id.* ¶ 26. Holden likewise asked Coleman as well as other WCI medical staff "to decontaminate the chemical agent from [Holden's] eyes and face to stop the burning," but they did not. *Id.* ¶ 27.

After several hours without a shower, Holden was returned to NBCI, where he explained to a housing unit tier officer that he had been sprayed, told the officer that he had not yet been decontaminated, and asked for a shower. *Id.* ¶¶ 28–29. The officer told Holden "that he would receive a shower on the 11:00 p.m. to 7:00 a.m. shift [(]which was hours away[)]." *Id.* ¶ 29. When

this shift "arrived later that night," Holden asked the tier officer for that shift "if he could take a shower to wash the mace off from his body" and explained that he had been "burning for hours." *Id.* ¶ 30. "A little while later," this officer told Holden "that the Captain said no, that he could not take a shower." *Id.*

On July 8, Platter was assigned to work as the tier officer on Holden's unit. *Id.* ¶ 32. Holden explained to Platter that he had been maced the day before, had not yet been decontaminated, "and that his skin [was] irritated and burning really bad from the effect of the mace." *Id.* Holden again asked for a shower, but Platter refused. *Id.*

Holden asked "his mental health provider," a woman named Ms. Pinardi, to help him get a shower "to wash the burning chemicals from his skin." *Id.* ¶ 33. Pinardi told Holden that she would try to help, "but still the security staff refused to allow [Holden] to shower and wash the chemical agent from [his] skin." *Id.*

On July 9, Holden told Fitzgerald that he had been sprayed with mace two days prior and had not yet been given a shower or otherwise decontaminated. *Id.* ¶ 34. Holden explained that when he sweated, the mace on his skin burned him. *Id.* Holden asked Fitzgerald for a shower, but Fitzgerald refused to give him one. *Id.*

On July 12, Holden "asked [Fink] for a shower and was denied," despite also having explained to her "that his skin was burning and irritated from being sprayed with a chemical agent[.]" *Id.* ¶¶ 35, 37.

Finally, on July 13, Holden was given a shower, "six days after being sprayed with a chemical agent, and constantly requesting for showers to wash the chemical from his skin[.]" *Id.* ¶ 36.

Holden states that official Maryland Department of Public Safety and Correctional Services ("DPSCS") policy on the use of chemical agents requires "that once the prisoner is restrained and no longer a danger . . . the chemical agent should be washed from the prisoner." *Id.* ¶ 25. He states that all defendants failed to follow this policy. *Id.* ¶ 39. He further states that all the events that he describes in his complaint were captured on video surveillance at WCI and NBCI. *Id.* ¶ 40.

On January 10, 2024, Holden filed this suit against the defendants in their individual capacities.[3] He accuses the defendants of violating his Eighth and Fourteenth Amendment rights. He seeks declaratory relief as well as compensatory and punitive damages totaling $2,500,000.

**B.      Evidence Submitted by Correctional Defendants**

The correctional defendants have filed a motion to dismiss or, in the alternative, for summary judgment. In support of their motion, the correctional defendants have submitted voluminous exhibits, which the Court has reviewed thoroughly.[4] The Court summarizes only those exhibits, or portions thereof, relevant to Holden's claims.

---

[3] The correctional defendants argue in their dispositive motion that they are immune from suit in their official capacities. ECF 28-1, at 13–14. Because the Court does not read Holden's complaint to assert any official-capacity claims, it need not consider this argument. Relatedly, the Court does not read Holden's complaint to assert any claims against WCI or NBCI, which are listed as defendants on the docket. Rather, he appears to list WCI and NBCI in the complaint caption to identify the facilities where the defendants work. The Clerk shall terminate WCI and NBCI as defendants.

[4] The correctional defendants also attached certain exhibits to their reply brief that they did not attach to their original motion: a surveillance video and additional declarations that, in part, concern the availability and preservation of surveillance footage at WCI and NBCI. ECF 36-1 – 36-3. Generally, when new evidence is attached to a reply brief in support of summary judgment, the court should not consider that evidence because "the non-movant has had no opportunity to respond." *Kurland v. ACE Am. Ins. Co.*, No. JKB-15-2668, 2017 WL 354254, at *4 (D. Md. Jan. 23, 2017). A court may consider such evidence, however, when "it responds to issues and facts raised in the non-movant[']s opposition brief." *Id.* The correctional defendants' new evidence is responsive to Holden's opposition, in which Holden asserts that he was not given a shower and that surveillance footage will confirm his account. However, Holden makes substantially the same allegation in his complaint, so the correctional defendants cannot claim that Holden caught them by surprise when he made the allegation again in his opposition. Out of an abundance of caution,

The correctional defendants have filed a declaration from Donaldson. ECF 28-4. Donaldson states that he maced Holden twice on July 7 after Holden flooded his cell, broke furniture, and refused orders to stop.[5] *Id.* ¶¶ 3–8. Donaldson states that Holden then complied with his orders and allowed himself to be handcuffed. *Id.* ¶ 9. Then, Donaldson states, he brought Holden to a cell in "Special Observation Housing," located in WCI's medical department, which contained "a bunk-type bed, toilet, and sink with hot and cold running water." *Id.* ¶¶ 10–11. At this point, Donaldson states that Holden "was offered a decontamination shower and medical evaluation" but "refused both." *Id.* ¶ 10. Donaldson denies that he ever refused Holden "the opportunity to take a decontamination shower." *Id.* ¶ 12.

Also included in the correctional defendants' submission is a copy of a grievance that Holden filed, which is dated July 13. ECF 28-6, at 3–4. In the grievance, which Holden verified under penalty of perjury, he describes being maced and denied a shower and states that "[m]edical staff were present and witnessed the incident, but did not detox the mace from my eyes[.]" *Id.* at 4. Holden also states that he asked a "female officer for a shower or something to stop my face and body from burning" but that he was not permitted to shower and the officer did not "give [him] anything to wash off the ma[c]e." *Id.*

_____

the Court will not consider the new exhibits attached to the correctional defendants' reply. Either way, the outcome is the same.

[5] Holden alleges that he was maced, whereas other evidence in the record (such as Donaldson's declaration) indicates that he was pepper-sprayed. Though the terms are often used interchangeably, mace and pepper spray are not necessarily the same thing. *See Mace vs. Pepper Spray: What's the Difference & Which to Use?*, Premier Body Armor, https://premierbodyarmor.com/blogs/pba/mace-vs-pepper-spray (last visited Mar. 23, 2026). Nevertheless, the Court's analysis does not depend on whether mace or pepper spray was used. In the interests of readability, the Court will refer to what happened to Holden as a macing.

The correctional defendants also have submitted documents relating to a use of force report that was filed after Donaldson maced Holden. ECF 28-9. These documents contain narratives from various correctional personnel reporting that, after Holden was maced, he refused a decontamination shower. *See, e.g.*, *id.* at 4, 5, 7, 27. Also included in this exhibit is a report by Coleman in which she states that after Holden was maced, she conducted a "post use of force assessment" in which she asked Holden "if he was OK or needed anything from medical," but Holden "would not answer or look at [her]." *Id.* at 18. Coleman further states in her report that Holden's "[r]espirations appear[ed] even and unlabored" and that she "instructed [Holden] and custody to have custody call if [Holden] decide[d] he need[ed] anything or [would] allow [Coleman] to assess him." *Id.*

The correctional defendants have submitted a declaration from Jason Clise, a case manager and assistant litigation coordinator at WCI. ECF 28-10. Like Donaldson, Clise states that after Holden was maced, Holden was transferred that same day to a Special Observation Housing cell containing a "bed, toilet, and sink with hot and cold running water." *Id.* ¶¶ 5–6. Clise adds that "[w]hen an Incarcerated Individual . . . has been exposed to pepper spray, in accordance with Departmental policy and procedures, [he] is escorted to the Medical department to be assessed for pepper spray," where his "eyes are flushed by Medical personnel" and he is "offered a decontamination shower by Custody Staff." *Id.* ¶ 7. Clise adds that "[a] decontamination shower occurs in a standard . . . shower area as a [courtesy] and is not covered under policy" and that it does not involve the use of "any special chemicals or treatments[.]" *Id.* ¶ 8.

The correctional defendants have filed a declaration from John White, a case management specialist at NBCI. ECF 28-11. White states that after the macing on July 7, Holden was returned to NBCI and assigned to administrative segregation, where he was again housed in a cell

containing a "bed, toilet, and a sink with hot and cold running water." *Id.* ¶¶ 5–6. White explains that under DPSCS policy, a prisoner on administrative segregation "shall be given the opportunity to shower at least twice weekly," and that if he takes a shower, "it will be indicated on the Record of Segregation Confinement Form with a 'Y' (Yes) on the date [he] received the shower." *Id.* ¶¶ 10–11.

The correctional defendants also have attached Holden's record of segregation confinement for his time on administrative segregation at NBCI. ECF 28-7, at 3. The document contains a calendar titled "Showers," in which each day between July 7 and July 19, inclusive, is marked with either a "Y" or an "N." *Id.* For the period in which Holden claims he was denied a decontamination shower (July 7 through July 13), the days July 7, July 10, and July 12 on the "Showers" calendar are marked with a "Y"; all other days are marked with an "N." *Id.*

Finally, the correctional defendants have submitted declarations from Platter, Fink, and Fitzgerald. ECF 28-12. These correctional defendants do not dispute that they were working on Holden's housing unit on the dates he alleges they denied him a shower. *Id.* at 2, 5, 8. However, they all state that to their knowledge, Holden showered twice or more during the period of July 7 through July 13; that they have no personal involvement in, and lack the authority to make any decisions concerning, a prisoner's medical care; that they are not aware of Holden ever filling out a sick call slip to request a decontamination shower from NBCI's private medical contractor; and that they have not "interfered with, hindered, or delayed" Holden's "medical treatment or care." *Id.* at 3–4, 6–7, 9–10. They further state that all prisoners have "access to running water in their cell, along with soap and a towel, to wash and clean themselves as necessary." *Id.* at 3, 6, 10.

### C.      Evidence Submitted by Coleman

Coleman has filed a motion for summary judgment. She has submitted various exhibits in connection with that motion, which the Court has reviewed and summarizes below.

Coleman has submitted a declaration. ECF 21-2. She states that Holden's medical records show that after Holden was maced on July 7, she conducted a "post use of force assessment" at Holden's cell in Special Observation Housing in which she "asked [Holden] if he was okay or needed anything from medical but he would not answer or look at me." *Id.* ¶ 8. Coleman states that she "was unable to assess [Holden] without his consent" and that correctional officers "would not open the cell door to allow me in to assess [Holden] if he did not answer me." *Id.* She states that she "instructed [Holden] and custody to call [her] back if [Holden] decided he needed anything or would allow me to assess him." *Id.* She adds that "[n]ursing cannot offer or prevent a decontamination shower" because "[t]hat is entirely a custody issue" and that "[s]ecurity is in charge at all times and will offer a decontamination shower if it is safe to do so." *Id.* ¶ 5.

Coleman also has submitted medical records, including a report she wrote that corroborates the statements in her declaration. ECF 21-3, at 2. She submitted a report from Sarah Pinardi, the mental health provider whom Holden mentions in his complaint. *Id.* at 4. In it, Pinardi states that on July 8, when Holden was back at NBCI, she spoke to Holden about the flooding and macing incident. *Id.* Pinardi states that Holden "asked about being able to shower," and she "reported that she would ask custody about this." *Id.* She then told Holden that "once he was off quarantine and appointments were allowed to run . . . he would be scheduled." *Id.*

### D.      Holden's Responses

Holden has filed a response to each dispositive motion. He does not attach any exhibits to either response. However, before signing his name to his responses, Holden affirms the truth of

the statements he has made therein. In his response to the correctional defendants' motion, Holden "declare[s] under the penalties that all words in my response . . . are true[.]" ECF 31, at 2. In his response to Coleman's motion, Holden "certif[ies] that all my statement[s] are true to the best of my ability." ECF 25, at 2. In light of Holden's pro se status, the Court will construe these responses as verified under penalty of perjury in substantial compliance with the requirements of 28 U.S.C. § 1746. *See, e.g.*, *Wilson v. Collins*, No. 7:08CV00638, 2010 WL 785377, at *3 n.5 (W.D. Va. Mar. 5, 2010) (pro se plaintiff's statement that "he [was] telling the truth from his personal knowledge and [could] prove his allegations" was sufficient to substantially comply with § 1746), *appeal dismissed*, 382 F. App'x 286 (4th Cir. 2010).

In response to the correctional defendants' motion, Holden denies that Donaldson ever offered him a shower after macing him or that he refused a shower. ECF 31, at 1. Holden states that when he was moved to the Special Observation Housing cell at WCI on July 7, Donaldson "walked [him] right pas[t] a shower" and that his cell was "right [across] from a shower." *Id.* He insists that he "wasn't offered a shower at no time" and was "refused a decontamination shower for six days[.]" *Id.* Somewhat confusingly, Holden then states: "To my [k]nowledge I received a shower twice in between [July 7 and July 13]. So if I received the shower twice in between [those dates] the cam[e]ra will show me going to the shower. I didn't receive a decontamination shower for six days and no cam[e]ra will show that." *Id.* It is unclear from this statement whether Holden is admitting or denying that he received a shower twice between July 7 and July 13. Nevertheless, construing the evidence in the light most favorable to Holden, the Court will assume Holden means to deny that he ever received a shower during that six-day period.

In response to Coleman's motion, Holden denies that he was nonresponsive when Coleman tried to assess him in the Special Observation Housing cell. ECF 25, at 1. Instead, Holden states

10

that he asked Coleman for a shower and that instead of giving him one, she responded that he "should have listened to them when they told [him] to stop messing up the room." *Id.* Then, Holden and Coleman "got into an argument over her not doing her job as a nurse-caregiver." *Id.* Holden states that Coleman should have asked the officers to give him a shower because "that was and is her job as a care provider and nurse." *Id.* at 2. Holden again denies that he ever received a decontamination shower. *Id.*

## II.    Standard of Review

Coleman has filed a motion for summary judgment, and the correctional defendants have filed a motion to dismiss or, in the alternative, for summary judgment. Because the Court considers evidence submitted by the correctional defendants and by Holden in resolving the correctional defendants' motion, the Court will treat the correctional defendants' motion as one for summary judgment pursuant to Rule 56. *See* Fed. R. Civ. P. 12(d). The Court is satisfied that Holden received notice that the motion could be treated as one for summary judgment. The Court notified Holden that he had the right to respond to the defendants' dispositive motions, that the motions could be construed as motions for summary judgment, and that if Holden did not file timely and adequate written responses, the Court could dismiss the case or enter judgment against him without providing him another opportunity to respond. ECF 22 & 29. Moreover, the correctional defendants' motion, which identifies summary judgment as possible relief, provided sufficient notice for Holden to have a reasonable opportunity to present relevant evidence in support of his position. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998). And, in fact, Holden presented evidence in support of his position. The Court is thus satisfied that Holden has been advised that the defendants' dispositive motions could be treated as motions for summary

11

judgment and that he has been given a reasonable opportunity to present materials in response to the motion. The Court will resolve the motions under Rule 56.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 252. The court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (citing *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, the court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

12

### III.    Discussion

#### A.    Motion for Leave to Amend

Holden has filed a motion for leave to amend his complaint. Pursuant to Rule 15, courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "A motion to amend should only be denied when 'the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 217–18 (4th Cir. 2019) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). In addition, the District of Maryland's Local Rules require that whenever a plaintiff seeks to amend his complaint, he must attach "the original of the proposed amended pleading" to his motion. *See* Loc. R. 103.6(a) (D. Md. 2025).

In his motion, which was filed months after the close of briefing on the defendants' dispositive motions, Holden states only that since filing his complaint, he has learned "the names of other individuals that share in the violations of [his] rights due to the events stated in [his] complaint." ECF 43, at 1. Holden did not attach a proposed amended complaint to his motion. Even so, the Court infers that Holden wants to add these individuals as defendants and possibly make new allegations against them. However, Holden does not say who these individuals are or explain how they violated his rights. Holden has not provided the Court sufficient information to determine whether amendment is warranted. Holden's motion for leave to amend is denied.

#### B.    Motion to Stay

Coleman has filed a motion to stay this case. In her motion, Coleman explained that her former employer, Tehum Care Services, Inc. f/k/a Corizon Health, Inc. ("Tehum"), had filed for bankruptcy in Texas and that the Bankruptcy Court had confirmed a Chapter 11 reorganization

13

plan. ECF 37, at 2; *see generally In re Tehum Care Servs., Inc. (f/k/a Corizon Health, Inc.)*, Case No. 23-90086 (CML) (Bankr. S.D. Tex.) ("*Tehum*"). When Coleman filed her motion, there was a pending motion before the Bankruptcy Court seeking to enjoin actions brought against Tehum's former employees. ECF 37, at 1. Coleman accordingly asked this Court to stay Holden's action "until and unless the Bankruptcy Court . . . permit[ted] it to continue." *Id.* at 3. The Court declined to consider Coleman's motion until Coleman "supplement[ed] the record with evidence of the nature and type of notice Holden was provided about the bankruptcy generally and about the opt-out process specifically and its applicability to his claims against defendants other than [Tehum]." ECF 38, at 2. Then, on August 7, 2025, the Bankruptcy Court issued an order allowing this case to proceed. *See* ECF 2374, at 11, in *Tehum*. Thus, Coleman's motion to stay is denied as moot.

###### C.    Summary Judgment Motions

The United States Code provides a federal cause of action for any individual who believes a state actor has deprived them of a constitutional right. *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). The statute "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Two elements are essential to state a claim under § 1983: (1) the plaintiff must have suffered a deprivation of "rights, privileges or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation must have been "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 45 n.3, 48 (1988) (quoting 42 U.S.C. § 1983).

### 1.   Eighth Amendment Claim

Holden claims that, by refusing to allow him to shower after he was maced, the defendants violated the Eighth Amendment. This claim fails as a matter of law.

"The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). To establish an Eighth Amendment violation, a prisoner must establish both that the prison official subjectively "acted with a sufficiently culpable state of mind" and that the injury or deprivation inflicted was objectively serious enough to constitute a violation. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). A use of force may violate the Eighth Amendment when it is objectively "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), and when the prison official applying force subjectively acts "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline," *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)).

The Fourth Circuit has recognized that prison personnel may be liable for excessive force under the Eighth Amendment when they refuse to permit a prisoner to decontaminate after he has been maced or pepper-sprayed. *See, e.g.*, *Mann v. Failey*, 578 F. App'x 267, 273 (4th Cir. 2014); *Williams*, 77 F.3d at 765. However, courts within the Fourth Circuit also have recognized that, even if a maced or pepper-sprayed prisoner is denied a shower, his Eighth Amendment rights are not violated if he has other means to decontaminate himself—such as cleaning supplies and running water. *See, e.g.*, *Phillips v. Saibu*, No. PWG-17-3221, 2019 WL 498820, at *6 (D. Md. Feb. 8, 2019) (no Eighth Amendment violation where, after deployment of pepper spray, prisoners declined medical attention and were "placed in a cell where there was running water available to wash the pepper spray off"); *Mitchell v. SCDC*, C/A No. 6:09-1010-RBH-KFM, 2010 WL

15

5174009, at *3 (D.S.C. Nov. 16, 2010) (officers not liable for excessive force when, "immediately following the administration" of chemical agent, they "gave the plaintiff access to water and allowed him to rinse off the effects of the spray"), *R&R adopted by* 2010 WL 5173863 (D.S.C. Dec. 15, 2010); *see also, e.g.*, *Wagner v. Warden*, No. ELH-14-791, 2016 WL 7178297, at *12 (D. Md. Dec. 8, 2016) ("[T]he Eighth Amendment may be violated if, following exposure to pepper spray, a prison inmate is not provided with the opportunity to shower *or wash off the offending substance*, at least when it is safe to do so.") (emphasis added).

Here, the undisputed record evidence establishes that Holden had access to running water and (at NBCI at least) soap and a towel in every cell in which he was housed between the macing incident and July 13. *See* ECF 28-4, ¶¶ 10–11; ECF 28-10, ¶ 6; ECF 28-11, ¶¶ 5–6; ECF 28-12, at 3, 6, 10. So even if Holden did not have access to a shower after he was maced, as he argues, there is no evidence (and Holden does not argue) that special chemicals or treatments are necessary to wash off mace. The undisputed evidence shows that Holden had access to running water and cleaning supplies after he was maced.[6] The defendants did not cause him to suffer an objectively serious deprivation of a basic human need or act with malice and/or deliberate indifference to his suffering after he was maced.

The defendants are entitled to summary judgment on Holden's Eighth Amendment claim.

### 2.    Fourteenth Amendment Claim

Holden also claims that the defendants violated his due process rights under the Fourteenth Amendment by failing to comply with an official policy regarding "the use of force involving the

---

[6] In his grievance, Holden claimed that an unidentified female officer did not "give [him] anything" to wash the mace off while he was in Special Observation Housing at WCI. ECF 28-6, at 4. This does not create a genuine dispute of material fact as to whether Holden *already had access to running water* in the cell.

use of chemical agents[.]" ECF 1, ¶ 39. Holden alleges the use-of-force policy requires that "once [a] prisoner is restrained and no longer a danger" after being pepper sprayed, "the chemical agent should be washed from the prisoner." *Id.* ¶ 25. This claim, too, fails as a matter of law.

To establish a due process violation under the Fourteenth Amendment, a plaintiff must show that (1) he had "a protected liberty or property interest" and (2) that he was "depriv[ed] of that interest without due process of law." *Cartagena v. Lovell*, 103 F.4th 171, 182 (4th Cir. 2024) (quoting *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015)). A prisoner can establish a protected liberty interest by pointing to "state laws or policies" that create an interest in particular conditions of confinement and by showing that the denial of that interest imposes "an atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Prieto*, 780 F.3d at 251 (quoting *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006)) (alteration in *Lovelace*).

Holden alleges that, pursuant to a prison policy, prison officials were required to give him a decontamination shower after he was maced and that he thus had a liberty interest in a decontamination shower. ECF 1, ¶¶ 25, 39. But the record does not support Holden's position. The record evidence shows that there is no policy requiring prison officials to provide a prisoner who has been maced with a decontamination shower. *See* ECF 28-10, ¶ 8 (explaining that "[a] decontamination shower occurs in a standard . . . shower area as a [courtesy] and is not covered under policy"). Holden does not rebut this evidence; in his declarations in opposition to the motions, he simply restates his allegation that he was not given a shower. *See* ECF 25 & 31.

Viewing the evidence in the light most favorable to Holden, there appear to be, at best, two prison policies related to mace and/or showering. First, there appears to be a policy that maced prisoners must be assessed by the medical department and have their eyes flushed by medical personnel. *See* ECF 28-10, ¶ 7 (stating that after a prisoner has been maced, they are "escorted to

17

the Medical department to be assessed for pepper spray" and have their "eyes . . . flushed by Medical personnel" "in accordance with Departmental policy and procedures"). Holden has not demonstrated a genuine dispute of material fact as to whether this policy was violated. Though Holden disputes that he was not responsive to Coleman, a member of the medical unit, when she visited him in Special Observation Housing, he does not dispute that Coleman tried to assess him and he refused. Medical personnel cannot assess or flush the eyes of someone who will not permit them to examine him. Even if this policy gave rise to a protected liberty interest, there is no evidence that Holden was deprived of it.

Second, there appears to be a policy that prisoners confined to administrative segregation must be allowed to shower at least twice a week. *See* ECF 28-11, ¶ 10. Even assuming Holden did not receive a shower between July 7 and July 13 while on administrative segregation at NBCI, Holden still has not established a due process violation. It is undisputed that Holden had access to running water, soap, and a towel in his cell and that he was able to cleanse himself. Thus, even if Holden was denied a shower for several days after being maced, he had the means to wash himself, and under these circumstances no reasonable juror could conclude that he suffered an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Prieto*, 780 F.3d at 251 (quoting *Lovelace*, 472 F.3d at 202) (alteration in *Lovelace*). Holden has not shown he was deprived of a protected liberty interest by being denied a shower during his time on administrative segregation.

The defendants are entitled to summary judgment on Holden's due process claim.

IV.    **Conclusion**

For the foregoing reasons, Holden's motion for leave to amend is denied, and Coleman's motion to stay is denied as moot. Coleman's motion for summary judgment is granted. The

correctional defendants' motion to dismiss or, in the alternative, for summary judgment, treated as

a motion for summary judgment, is granted. Judgment shall enter for the defendants on Holden's

claims. A separate Order follows.

Date:_March 25, 2026_____                    _____
                                              Deborah L. Boardman
                                              United States District Judge